## W. J. McCAHAN SUGAR REFINING & MOLASSES CO. v. STOFFEL.

### No. 4314.

Circuit Court of Appeals, Third Circuit.

May 27, 1930.

Louis Wagner, R. A. Smith, and W. F. Whittle, all of Philadelphia, for appellant.

Mortimer W. H. Cox, of Philadelphia, for appellee.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and SCHOONMAKER, District Judge.

WOOLLEY, Circuit Judge.

John Stoffel, a stevedore engaged in unloading cargo from a ship in navigable waters of the United States and therefore a "seaman" within the meaning of the law, Atlantic Transport Co. v. Imbrovek, 234 U. S. 52, 34 S. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157; International Stevedoring Co. v. Haverty, 272 U. S. 50, 47 S. Ct. 19, 71 L. Ed. 157, filed this libel in personam to recover for personal injuries. He elected to sue in admiralty under the Act of March 4, 1915, 38 Stat. 1185, as amended by section 33 of the Act of June 5, 1920, 41 Stat. 1007 (46 USCA § 688) and on authority of Panama R. Co. v. Johnson, 264 U. S. 375, 44 S. Ct. 391, 68 L. Ed. 748, and Buzynski v. Luckenbach Steamship Co., 277 U. S. 226, 228, 48 S. Ct. 440, 72 L. Ed. 860.

The cargo was sugar. The manner of discharging was as follows:

Drafts, consisting of seven bags to the sling, were hoisted by the ship's winch from the hold to the deck and deposited at the base of a skid. The hook on the line from the ship's winch was then removed and the hook on a line from a winch ashore was attached to the sling. On signal from the libellant to the winchman, the draft was dragged up the skid, lifted over the rail, let down into a waiting truck and thence moved away. This operation, which was common practice and had been going on for some time, was not dangerous if carried out in this manner, for all the libellant had to do to avoid injury was to step aside before giving the signal. It was, however, highly dangerous if the winch should be started and the draft lifted before signal, for that left the libellant in a position of danger and gave him no time to get out of it. In this instance the winch was started and the draft suddenly lifted— the libellant says, before signal; the respondent says, after signal. It struck the libellant, inflicting the injuries for which he is suing.

The trial court found the winch started before a signal was given. That is the key-fact of the whole case. On that fact, as found by the trial court on conflicting evidence and, were it necessary, as it would be found by this court, the decision of all questions raised by the assignments of error, save one, will be predicated.

Of the first four questions, none calls for lengthy discussion. All are, directly or indirectly, fact questions. Working backward, the fourth is whether damages in the sum of $3,750 are excessive. We find them moderate. At all events they are sustained by evidence.

The third question, affecting a pro tanto reduction of damages, is whether the libellant negligently contributed to the injury. His action in respect to the hoist was purely negative. After the hook had been attached to the draft he did nothing. But the respondent's winchman did something—he hoisted the draft before signal. Then, and not until then, did the action which resulted in the accident begin; and then it ended. Yet the libellant is charged with negligence for simply standing there "waiting." Though physically doing nothing, he was actually doing something in the line of his duty— "Waiting for the truck to come by"; waiting "to see if there was any trucks" in which to deposit the draft before signalling the winchman to hoist it and lower it into a truck. The finding of no contributory negligence is sustained.

The second question is whether the hoisting of the draft before the libellant signaled was the proximate cause of the injury. It must have been, for that was the only thing done by either party. Yet the respondent argues that it was not the "act" of lifting the draft before signal that caused the injury but the "manner" of the lifting— the sudden start and subsequent swing—and that its movement would have been the same and there would have been the same resultant injury to the libellant if the lift had been made in response to his signal. That, we think, rather begs the question, for the libellant, before giving a signal, could, as he had always done, have moved out of the way. We hold with the learned trial judge that in starting the draft before receiving a signal the winchman violated his duty and therefore was guilty of negligence that was the proximate cause of the injury.

■■ The first question—whether the libellant assumed, as one of the risks of his employment, the risk of injury from the movement of the draft—is predicated on the assumption that the "manner" in which the draft moved was the proximate cause of the injury, not the winchman's act of hoisting the draft without signal. Having found that the proximate cause was the winchman's act of lifting the draft before signal, the respondent's contention that the libellant assumed the risk of the movement that resulted in his injury is rested on a false predicate. "An employee assumes the risks normally and necessarily incident to his employment, and also the extraordinary risks, or risks caused by his master's negligence; yet, he assumes the latter only when they are obvious or fully known by him and are such as would under the circumstances be seen and appreciated by an ordinarily prudent person." Director General v. Templin (C. C. A.) 268 F. 483, 485; Davis v. Crane (C. C. A.) 12 F.(2d) 355, 356, 357. That the winchman would, contrary to practice, suddenly lift the draft without signal was something the libellant could not anticipate and against which he could not protect himself. It was therefore an act of his master's negligence raising an extraordinary risk which he did not assume.

The serious question in the case, arising as a matter of defense, is whether an agreement into which the libellant and respondent entered after the accident, whereby the libellant agreed to accept compensation and the respondent to pay for the injury in accordance with the Pennsylvania Workmen's Compensation Law, is valid.

This is an odd agreement. It has two parts; the first is a palpable effort to draw the injury and its recipient under the Pennsylvania Workmen's Compensation Law (Act June 26, 1919, P. L. 642 [Pa. St. 1920, § 21993 et seq.]), and the other is an out-and-out release made by the injured seaman to his employer. We hold that the two parts, though separately signed, should be read together and that together they constitute one instrument. It is headed—"Pennsylvania Department of Labor and Industry, Workmen's Compensation Bureau, Harrisburg, Pennsylvania," and is entitled—"An Agreement for Compensation and Disability." Then follow (in blanks filled in) the names and occupations of employer and employee, date and place of disability, cause of disability, and finally an agreement, which reads:

"And it is hereby further agreed that the said McCahan Sugar Refining Company (employer) shall pay to the said John P. Stoffel (employee) compensation at the rate of $12 per week, payable weekly, beginning from January 9, 1927, for —— weeks, (To be used only if incapacity has terminated or its duration rendered certain by Section 306-e).

"For —— weeks as provided by Section 306 (a) if the incapacity is total.

"For —— weeks as provided by Section 306 (b) if the incapacity is partial."

The omission to fill in these blanks, though important, is not solely determinative of the question in view of what we are about to say.

Continuing, the agreement states that weekly payments shall be made "until this agreement has been terminated by final receipt or supplemental agreement approved by the Workmen's Compensation Board or by the order of such Board." Following many more blanks, not filled in, are the signatures of the parties. Then in the same paper and immediately after the signatures there is another agreement signed by the libellant releasing the respondent from all liability, claims, causes of action, etc., arising from the accident, in consideration of the payment of the single sum of $12, and concluding with his declaration that he is "fully compensated for all thereof," when in fact he showed in the same instrument, his employer concurring, that he had not been fully compensated but was, according to its terms, entitled to weekly payments of a like sum running indefinitely into the future.

■■ There is no question that seamen, though favored by the law and regarded as wards in admiralty, are capable of making releases for maritime injuries, yet in making such releases their rights are tenderly guarded and their acts, when waiving or yielding their rights, are carefully scrutinized. The Adonis (C. C. A.) 38 F.(2d) 743. Looking into the agreement in suit, we hold it void for several reasons: First, because it is indefinite as to the number of weekly payments and therefore is incomplete; second, because of lack of mutuality; third, because termination of payments, and therefore duration of payments, depends upon another agreement, called a supplemental agreement, to be "approved by the Workmen's Compensation Board" or upon final payment on that Board's order, neither of which has happened; fourth, because against public policy. Though void for any one of the first three

reasons, the last is the one of capital importance.

The law regards a longshoreman or stevedore, injured while engaged in maritime service aboard a ship lying in navigable waters, as a seaman with all his peculiar rights and immunities. There has been more or less protracted legislative—and judicial, —effort to bring such seamen, who under federal admiralty acts are entitled to sue for compensation for injuries in federal courts, within the scope of state compensation acts. The Supreme Court, reviewing from time to time the position of seamen, the policy of preserving a uniform maritime law and the impolicy of bringing seamen under diverse laws of states, has held such efforts unconstitutional as destroying the characteristic features of the general maritime law, contravening its essential purposes, encroaching upon the paramount power of the Congress to enact national maritime laws and invading the jurisdiction which the Congress has conferred upon courts of admiralty. Butler v. Boston & Savannah Steamship Co., 130 U. S. 527, 9 S. Ct. 612, 32 L. Ed. 1017; Southern Pacific Co. v. Jensen, 244 U. S. 205, 37 S. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900; Chelentis v. Luckenbach S. S. Co., 247 U. S. 372, 382, 38 S. Ct. 501, 62 L. Ed. 1171; Knickerbocker Ice Co. v. Stewart, 253 U. S. 149, 163, 40 S. Ct. 438, 64 L. Ed. 834, 11 A. L. R. 1145; Clyde Steamship Co. v. Walker, 244 U. S. 255, 37 S. Ct. 545, 61 L. Ed. 1116, distinguishable on the facts from State Industrial Commission v. Nordenholt Corporation, 259 U. S. 263, 42 S. Ct. 473, 66 L. Ed. 933, 25 A. L. R. 1013, and Grant Smith-Porter Ship Co. v. Rohde, 257 U. S. 469, 42 S. Ct. 157, 66 L. Ed. 321, 25 A. L. R. 1008; and distinguished in Span v. Baizley Iron Works, 295 Pa. 18, 144 A. 753, on a fact finding that the workman's injury was the result not of negligence but of pure accident, and that the service being rendered by him at the time of the injury was not truly maritime but rather local in character subject to local compensation law.

In the case in hand the respondent tried to do what the Supreme Court has said state Legislatures cannot do. The attempt was, pari ratione, equally void. If this contract were otherwise good, it would still be bad because opposed to public policy. But aside from this vital defect, the contract, with the ingrafted release, is void for the three reasons first stated.

The decree of the trial court is in all respects affirmed.