**Giuseppe CAPOTORTO,**
**Plaintiff-Appellant,**

v.

**COMPANIA SUD AMERICANA de VAPORES, CHILEAN LINE, INC.,**
**Defendant-Appellee.**

**No. 1113, Docket 76–7123.**

United States Court of Appeals, Second Circuit.

Argued June 14, 1976.

Decided Sept. 3, 1976.

Lester E. Fetell (Sergi & Fetell, Brooklyn, N. Y.), for plaintiff-appellant.

Thomas Coyne, New York City (Kirlin, Campbell & Keating, Louis J. Gusmano,

New York City, of counsel), for defendant-appellee.

Before SMITH, MANSFIELD and OAKES, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Giuseppe Capotorto, a longshoreman, appeals the dismissal by the United States District Court for the Eastern District of New York, John R. Bartels, *Judge*, of his action for a judgment declaring invalid his purported release of Compania Sud Americana de Vapores, Chilean Line, Inc. (the defendant) from all claims arising out of an accident which injured him while working aboard defendant's vessel. We affirm.

On October 9, 1972, while working as a longshoreman aboard defendant's vessel, Capotorto injured his back. His employer, Pittston Stevedoring Corporation, sent him initially to two doctors for treatment and then in November of 1972 to a third, a Dr. Vaccarino, for further examination. All three doctors diagnosed Capotorto's injury as a lumbosacral sprain.

In February of 1973, at the suggestion of the doctor then treating him, Capotorto resumed work as a longshoreman. In June of 1974, however, he had another accident while working on a vessel not belonging to the defendant. At trial he testified that as a result he reinjured his back, but the doctors who examined him after this accident noted injury only to his knee, ankle, and foot.

Prior to the 1974 accident, Capotorto sued the defendant on the basis of the injuries sustained in the accident of 1972. But on December 24, 1974, upon the advice of the attorney then representing him, he concededly signed a document purporting to release the defendant from all claims arising out of the 1972 accident in return for $16,182.57.

On March 2, 1976, the court concluded that this document constituted an effective release and dismissed the declaratory judgment action brought by Capotorto to set it aside.

On appeal, Capotorto challenges the validity of the release on two grounds. First, he contends that at the time it was signed the parties mistakenly thought that the 1972 accident had resulted in merely a lumbosacral sprain when, in fact, it had resulted in a herniated disc. Capotorto bases this contention on Dr. Vaccarino's testimony that, after re-examining Capotorto in February of 1975, he concluded that the appellant was suffering from a herniated disc caused by the accident in 1972 and exacerbated by the one in 1974. The district court rejected this testimony, however, stating:

> The Court concludes that the diagnosis by Dr. Vaccarino in the beginning of 1975 of a herniated disc caused by the 1972 accident and exacerbated by the 1974 accident is not plausible and is not accepted by the Court for the reason that after the October 1972 accident, Dr. Vaccarino diagnosed the injury only as a lumbarsacral [sic] sprain.
>
> Moreover, since all the other doctors stated the plaintiff only suffered a knee and ankle injury in the 1974 accident, that [sic] it is very difficult to see how the June 14th, 1974 accident could exacerbate or create a herniated disc condition not theretofore diagnosed. It is to be noted that at the trial no X-rays were offered or produced, nor was a myelogram performed on the plaintiff.

The trial court's conclusion that Capotorto had not suffered a herniated disc because of the 1972 accident was not clearly erroneous.

Capotorto failed to establish that his 1972 injury was more serious than he realized when he signed the release on the advice of his then lawyer in December, 1974, or that the lawyer failed to advise him, even though he may have taken only five minutes from a Christmas party to talk with him. He failed to prove any mistake in his then estimation of the extent of his injuries. His lawyer had long and successful experience in the field. His lawyer's treatment of him, while no model of attorney-client relations, forms no basis for a finding of lack of appreciation of the nature

of his claim. Appellant's argument that the release was predicated upon an erroneous diagnosis of the accident's consequences therefore fails for lack of a factual basis.

Capotorto also contests the validity of the release on the ground that he would not have signed it had he not been inadequately advised by the attorney then representing him as to possible claims for future sequelae of the injury. Even if there were a factual basis for this argument,[1] it appears to be legally insufficient.

Capotorto does not contend that a release should normally be set aside because of the injured party's reliance upon the inadequate advice of his own attorney. Rather he makes the more narrow two-step argument that a shipowner may not rely upon a release executed by a seaman because of inadequate advice of counsel and that a longshoreman should be treated like a seaman where the validity of a release obtained by a shipowner is in issue.

Courts have historically been more hostile to seamen's releases than to those executed by other workers. *Compare, e. g., Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248, 63 S.Ct. 246, 87 L.Ed. 239 (1942) and *Kelcey v. Tankers Co.*, 217 F.2d 541, 545 (2d Cir. 1954) with *Callen v. Pennsylvania R. R.*, 332 U.S. 625, 630, 68 S.Ct. 296, 92 L.Ed. 242 (1948), and *Ricketts v. Pennsylvania R. R.*, 153 F.2d 757, 759, 770 (2d Cir. 1946). See also, *e. g., Muruaga v. United States*, 172 F.2d 318, 320 (2d Cir. 1949); *Bartholomew v. Universe Tankerships, Inc.*, 168 F.Supp. 153, 156–57 (S.D.N.Y.1957), *aff'd*, 2 Cir., 263 F.2d 437, *cert. denied*, 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959). In *Blanco v. Moran Shipping Co.*, 483 F.2d 63 (5th Cir. 1973), *cert. denied*, 416 U.S. 904, 94 S.Ct. 1608, 40 L.Ed.2d 108 (1974), the Fifth Circuit vacated a summary judgment upholding a seaman's release because some question remained as to whether the seaman's attorney had sufficient information and afforded him "adequate legal advice."

We need not consider *Blanco* and other seamen's cases here, however, since longshoremen do not share with seamen special problems that may justify the invalidation of releases executed by them because of inadequate advice of counsel.

The particularly authoritarian relationship of shipowners and their representatives to seamen and the isolation of the latter from the legal, economic, and psychological support of a landbased community may put the seamen at a serious bargaining disadvantage. Longshoremen, more closely similar to other workers ashore, do not confront these problems. Nor do we think special treatment of longshoremen is dictated by other considerations formerly cited to justify the status of seamen as "wards of admiralty," such as their alleged propensity toward "rashness" and "credulity," see, *e. g., Brown v. Lull*, 4 Fed. Cas. 407, 409 (No. 2018) (C.C.D.Mass.1836); *Harden v. Gordon*, 11 Fed.Cas. 480, 485 (No. 6047) (C.C.D. Maine 1823), and the United States' military and commercial interest in protecting its maritime industry, see, *e. g., Hume v. Moore-McCormack Lines, Inc.*, 121 F.2d 336, 346–47 (2d Cir.), *cert. denied*, 314 U.S. 684, 62 S.Ct. 188, 86 L.Ed. 547 (1941). We note that the Congress, shortly after the accident here, has recognized a difference between the status of seamen and longshoremen in relation to the ship, ending the liability of the ship to longshoremen for personal injuries due to unseaworthiness, while increasing compensation rates for longshoremen's injuries under the Longshoremen's and Harbor Workers' Compensation Act. See *Napoli v. Hellenic Lines, Ltd.*, 536 F.2d 505, 507 (2d Cir. 1976), and cases cited in n.3.

In short, we see no compelling reason to apply more stringent standards to longshoremen's releases for injuries sustained aboard ship than to those entered into by longshoremen and other workers for injuries sustained ashore. *Harris v. Lykes Bros. Steamship Co.*, 375 F.Supp. 1155, 1157 & n. 1 (E.D.Texas 1974);[2] 1 Norris, *The*

---

1. The trial court did not specifically determine whether Capotorto had been adequately advised as to possible future claims by this attorney.

2. The precedential significance of this decision has been undercut by dictum in *Robertson v. Douglas Steamship Co.*, 510 F.2d 829, 834–36 (5th Cir. 1975). We note, however, that *Rob-*

*Law of Maritime Personal Injury* § 6, at 13 (3d ed. 1975). *Contra, Wooten v. Skibs A/S Samuel Bakke,* 431 F.2d 821, 823 (4th Cir. 1969);[3] *W. J. McCahan Sugar Refining & Molasses Co. v. Stoffel,* 41 F.2d 651, 654 (3d Cir. 1930); 1 Edelman, *Maritime Injury and Death* 442 (1960) (construing *Garrett v. Moore-McCormack Co.,* 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942), as implying in dictum that the law of maritime releases should not distinguish between seamen and longshoremen); *cf. Robertson v. Douglas Steamship Co.,* 510 F.2d 829 (5th Cir. 1975).

Affirmed.

OAKES, Circuit Judge (dissenting):

I respectfully dissent.

The majority opinion is premised on the proposition that longshoremen and seamen should be treated quite differently by the law of admiralty. However imaginative and arguable this idea may be in the abstract, I submit that it does not accord with twentieth century American precedents in the field. And however desirable the idea may be as a matter of social policy, based upon longshoremen's quite ready access through unions to support and medical services, if not legal counsel,[1] this court should not indulge in this sort of policymaking.

At least since *Atlantic Transport Co. v. Imbrovek,* 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914), longshoremen have been viewed by the courts as mariners when injured in maritime accidents. Speaking

for a unanimous Court in *Imbrovek,* citing a long line of lower federal court cases, then Mr. Justice Hughes "entertain[ed] no doubt" that seamen and longshoremen injured on a ship (as was Mr. Capotorto here) should be equally protected, since longshoremen performed a necessary maritime service formerly performed by the ship's crew. *Id.* at 61–62, 34 S.Ct. 733. He noted that longshoremen are a class " 'as clearly identified with maritime affairs as are the mariners.' " *Id.* at 62, 34 S.Ct. at 735, *quoting The Circassian,* 1 Ben. 209, 5 F.Cas. 702 (No. 2722) (E.D.N.Y.1867). It is this view of the longshoreman's position, and not the majority's distinction based on isolation of seamen from "the legal, economic, and psychological support of a landbased community," that has been repeatedly expressed by the Supreme Court in the years since 1914. *See, e. g., International Stevedoring Co. v. Haverty,* 272 U.S. 50, 52, 47 S.Ct. 19, 71 L.Ed. 157 (1926) (Holmes, J.); *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 93–96, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 412–13, 74 S.Ct. 202, 98 L.Ed. 143 (1953); *United New York & New Jersey Sandy Hook Pilots Association v. Halecki,* 358 U.S. 613, 617, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959); *Gutierrez v. Waterman Steamship Corp.,* 373 U.S. 206, 213, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *Waldron v. Moore-McCormack Lines,* 386 U.S. 724, 728, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967); G. Gilmore & C. Black, The Law of Admiralty 438–41 (2d ed. 1975).

*ertson* involved the question of mutual mistake and that it did not even mention *Harris.*

**3.** *Wooten v. Skibs A/S Samuel Bakke,* 431 F.2d 821 (4th Cir. 1969), holds that the burden of proving a maritime release is part of the general law of admiralty applicable to seamen and longshoremen. However, the release in *Wooten* was based upon a mutual mistake of fact, which alone would be sufficient to set aside the release. The Court in *Wooten* also states that since plaintiff is a longshoreman working on board a ship in navigable waters, he is entitled to the seaman's traditional and statutory protections, citing *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). The *Sieracki* case extended the doctrine of unseaworthiness to longshoremen, but by amend-

ment to the Longshoremen's and Harbor Workers' Compensation Act, Congress has expressly abolished this doctrine with respect to longshoremen. The protections afforded seamen and longshoremen differ in many respects, and the Court is of the opinion that these differences are based upon sound reasoning.

*Harris v. Lykes Bros. Steamship Co.,* 375 F.Supp. 1155, 1157 n. 1 (E.D.Texas 1974). *But see* note 2 *supra.*

**1.** Such access is offset to some extent by the fact that stevedoring is one of the most hazardous of occupations, perhaps more hazardous than other forms of maritime labor. *See Salgado v. M. J. Rudolph Corp.,* 514 F.2d 750, 756 & n. 7 (2d Cir. 1975).

Moreover, a distinction based on isolation from civilization is not exactly consistent with the cases that have held the crews of inland barges and dredges to be seamen. *See, e. g., Senko v. LaCrosse Dredging Corp.*, 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957). Longshoremen performing stevedoring work on board a vessel probably have at least as much connection with the traditional hazards of ships and sea as do workers on board canal and river barges. The real point is that since a line must be drawn somewhere in defining a class that wears the protective mantle of the "seaman," and since historically that definition has been a broad one, a line based on function is more workable, possibly more accurate, and certainly more in accord with precedent than one based on an inherently speculative degree of isolation from "the legal, economic, and psychological support" of civilization.

The historic relationship for purposes of maritime injury between longshoremen and seamen has been applied to the treatment of the releases from liability that they often execute. *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 246–47, 63 S.Ct. 246, 87 L.Ed. 239 (1942), placed the affirmative burden on the shipowner to prove that no advantage was taken of a seaman who signed a release, and "that it was made by the seaman with full understanding of his rights." *Id.* at 248, 63 S.Ct. at 252. The Court seemed clearly to include longshoremen within its definition of "seamen," since it cited as evidence of the solicitous congressional policy toward seamen's releases "the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 915, 916, in which all releases not made under the express terms of the Act are declared invalid." *Id.* at 247, 63 S.Ct. at 252.[2] At least one commentator has also seen in *Garrett* the "clear implication" that longshoremen injured aboard ship are to be protected by "a federal admiralty rule as to the burden of proof in sustaining a seaman's release." 1 Edel-

man, Maritime Injury and Death 442 (1960). Furthermore, the only three circuit courts heretofore to consider the question have thought that longshoremen's and seamen's releases should be looked at with the same jaundiced eye. *Robertson v. Douglas Steamship Co.*, 510 F.2d 829, 834–35 (5th Cir. 1975); *Wooten v. Skibs A/S Samuel Bakke*, 431 F.2d 821, 823 (4th Cir. 1969); *W. J. McCahan Sugar Refining & Molasses Co. v. Stoffel*, 41 F.2d 651, 653–54 (3d Cir. 1930).

The majority's attempt to distinguish *Robertson* and *Wooten* is, I suggest, off the mark. It is said that those cases involved a mutual mistake of fact, but a cogent argument can be made that the parties in this case have made a similar mistake, *see infra*. Whether we decide that such a mistake affected the validity of Capotorto's release depends entirely on which party has the burden of proof as to the validity of that release. This precise issue had to be faced in both *Robertson* and *Wooten* and was decided in favor of the longshoreman in both cases.

The majority opinion also suggests that the Fourth Circuit's *Wooten* decision is seriously undercut by its reliance on *Seas Shipping Co. v. Sieracki, supra*, the controversial case making a cause of action for unseaworthiness available to longshoremen; *Sieracki's* holding in this respect was overturned by the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905 (Supp. V 1975). *Wooten*, however, referred to *Sieracki*, not for its creation of the cause of action, but for its general statement that a longshoreman is thought of as a seaman for many purposes " 'but he is doing a seaman's work and incurring a seaman's hazards.' " *Wooten, supra*, 431 F.2d at 823, *quoting Sieracki, supra*, 328 U.S. at 99, 66 S.Ct. 872. As pointed out *supra*, this concept long antedates *Sieracki* and refers to a confluence between the functions of seamen and longshoremen that transcends any single

---

**2.** These sections relating to releases were not changed by the 1972 amendments to the Long-

shoremen's and Harbor Workers' Compensation Act, Pub.L. No. 92–576, 86 Stat. 1251.

cause of action. The 1972 amendments, as this court recently pointed out, were simply a tradeoff among interest groups that, insofar as is here relevant, abolished the longshoremen's *seaworthiness* cause of action against shipowners—the *Sieracki* action—in return for higher benefits and broader coverage under a statutory compensation scheme. *See Pittston Stevedoring Corp. v. Dellaventura*, 544 F.2d 35, 40 (2d Cir. 1976), G. Gilmore & C. Black, *supra*, at 411. The legislation does *not* purport to affect either *negligence* causes of action by longshoremen against shipowners or the traditional value judgment of the admiralty courts that longshoremen are, in the absence of contrary statutory provisions, to be treated like seamen.

I therefore agree with the Third, Fourth and Fifth Circuits and believe that appellee had the burden of proving the validity of Capotorto's release. With the burden thus cast, it seems plain that, for two independent reasons, the judgment must be reversed.

First, the weight of the evidence indicates that Capotorto did not receive sufficient legal advice to understand the terms of the release that he signed. Capotorto does not read or write English, and he speaks it to only a limited extent. While he is presently an American citizen, his schooling was limited to eight grades in Italy. Without consulting Capotorto, his attorney, Mr. Lasoff, agreed with the shipowner's insurer to a release in return for $16,182.57 (that is, $12,500 in addition to a compensation lien of $3,682.57). On December 18, 1974, Lasoff wrote Capotorto, asking him "to come into the office . . . with reference to the possible settlement of your case." Capotorto came to the office on December 24, during a sandwich and champagne Christmas party. Lasoff spent at most five minutes with Capotorto, who complained that "my back still hurts me." Lasoff recommended settlement on the

ground that, because Capotorto had not seen a doctor in 18 months, a jury would not believe that he still had a back pain. The attorney did not recommend that Capotorto see another doctor but did tell Capotorto that if his back still bothered him, "he would have no problem filing a claim which would be treated as a separate act" under the compensation law. Capotorto can hardly be considered to have understood the difference between having future compensation claims based on some other action under federal law and having a future law suit against the appellee. "Five minutes" during an office Christmas party is certainly not conducive to any such understanding. Appellant subsequently asked his attorney a number of times to seek reinstatement of his compensation payments, but Lasoff explained to him "that he [Capotorto] had signed a release." Thus, Capotorto's subsequent statements indicate that he was confused, or at least that he had the understanding that he could reinstate his compensation payments, regardless of the signed release. Lasoff's testimony was that his own recollection of the Christmas party conversation was "not that specific" to enable him to say whether his client understood him or not, referring, as I read his testimony, to the difference between workmen's compensation and a law suit.[3]

The second reason that appellee cannot carry its burden of proving the validity of Capotorto's release is that there is enough evidence to suggest that the parties were under a mutual misapprehension as to the nature of Capotorto's injuries when the release was signed. The parties based their settlement on the diagnosis of several doctors, including a Dr. Vaccarino, that Capotorto had a lumbosacral sprain. But Capotorto was subsequently diagnosed by Dr. Vaccarino as having a herniated disc caused by his 1972 accident and exacerbated by a 1974 accident. The court below did not accept this diagnosis on two grounds, neither of which, respectfully, withstands anal-

---

**3.** These facts raise the possibility that Capotorto may have a cause of action against attorney Lasoff for urging him to sign the release without advising him fully or accurately, a possibility also recognized by the court below.

ysis. The first is that Dr. Vaccarino originally diagnosed the injury "only [as] a lumbarsacral [sic] sprain." But particularly in as tricky a medical area as the lower back, where intervertebral discs are potentially involved and where diagnoses are often judgmental and frequently revised after a lapse of time,[4] it is by no means extraordinary that what was originally diagnosed as a lumbosacral sprain is, with increased or different symptomology, later diagnosed as a herniated disc.

The second ground given by Judge Bartels is that "all the other doctors stated the plaintiff only suffered a knee and ankle injury in the 1974 accident, [so] that it is very difficult to see how [that] accident could exacerbate . . . a herniated disc condition not theretofore diagnosed." But the judge did not detail how the 1974 accident happened. As Mr. Capotorto testified, "I was working down in the hatch and I fell down a distance of maybe four feet and I injured my knee and my ankle." He was given treatment by Dr. Guarino, and he showed the doctor his knee: "my knee was full of blood and my ankle I could not set my ankle down on the ground and the fall that occurred to me at that time once again my back started to hurt [sic]." The judge's "all the other doctors" thus consisted solely of a Dr. Guarino, and we do not know— since that physician did not testify and his own records were not put into evidence by the party with the burden of proof—what his views were or whether he was advised of the recurrence of back pain. What does seem plain enough is that a fall of four feet serious enough to injure a knee and ankle as described by Mr. Capotorto is plainly serious enough to exacerbate a disc condition or indeed to cause extrusion of the nucleus pulposus where the annulus fibrosus has already indicated some pathology.[5] Judge Bartel's diagnosis (that Dr. Vaccarino was mistaken), with all apologies, is thus based on unsound medical premises. And, as Judge Wisdom said for the Fifth Circuit in *Robertson v. Douglas Steamship Co., supra,* 510 F.2d at 836 (emphasis in original):

> While it is true that a release should not be set aside for mutual mistake concerning the *extent* and *outcome* of injuries, which are necessarily future rather than present facts, it does not follow that a release should not be set aside for mutual mistake concerning the *nature* of the injuries, which is a present fact. The legal distinction must rest on the medical difference between diagnosis and prognosis.

In summary, there is substantial evidence to suggest both that Capotorto did not know the legal consequences of execution of the release and that all parties were mistaken in thinking that they were settling a back sprain case rather than a disc case. For each of these reasons, I believe appellee did not sustain its affirmative burden of establishing the validity of the release. *Garrett v. Moore-McCormack Co., supra.*

I would reverse the judgment.

---

4. For a discussion of the difficulty involved in diagnosing certain disc conditions, *see, e. g.,* Echlin, *Herniation and Protrusion of Intervertebral Disc Tissue,* in Injuries of the Brain and Spinal Cord 613–14 (4th ed. S. Brock 1960); M. Howorth, A Textbook of Orthopedics 1036–37 (1952).

5. *See, e. g.* M. Howorth, A Textbook of Orthopedics 1028 (1952); J. Key & H. Conwell, The Management of Fractures, Dislocations and Sprains 282–83 (6th ed. 1956).