**CHEN CHUN MEI CHANG, et al., Plaintiffs,**

**v.**

**ZENITH NAVIGATION S.A. and Sea King Corp., Defendants.**

**No. 77 Civ. 4208 (IBC).**

United States District Court, S. D. New York.

Sept. 7, 1979.

---

Kreindler & Kreindler, New York City, for plaintiffs; Paul S. Edelman, New York City, of counsel.

Poles, Tublin, Patestides & Stratakis, New York City, for defendants; Alvin L. Stern, New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

Defendants move under Rules 12(b)(6) and 56(b), F.R.Civ.P., for an order dismissing the complaint, for failure to state a claim upon which relief may be granted or granting summary judgment on the ground the claims were released. Plaintiffs cross-move for an order granting discovery and inspection of defendants' corporate books and directing the depositions of Chin Yu Hsu, also known as James Y.S. Chen. For the reasons set forth below, plaintiffs' motion is granted and defendants' motions are denied.

### The Complaint

The Complaint, which demands a jury trial, alleges that fifteen alien seamen died or were lost at sea on or about December 30, 1976 while engaged in the performance of their duties on board, or following orders to abandon, the merchant vessel Grand Zenith; that the vessel sank in navigable waters (off Cape Cod, Massachusetts); and that the deaths or disappearances were caused by defendants' negligence (the Jones Act claim) or the unseaworthiness of the vessel (the General Maritime Law and Death on the High Seas Act claim). Plaintiffs are the personal representatives and individual family members of the seamen.

Defendants are alleged to be the entities which employed decedents and operated the S/T Grand Zenith under a flag of convenience. Defendant Sea King Corp. is claimed to be a New York corporation; defendant Zenith Navigation S.A., a Panamanian corporation with a principal office in New York. The majority stock of both is alleged to be owned or controlled by U.S. citizens or residents. Further, the Complaint alleges that the principal business and transactions of the defendants, and ports called upon by the Grand Zenith, were in the United States.

Finally, the Complaint seeks over $6,000,-000, in the aggregate, as damages for decedents' estates and for their families' loss of their society and comfort. Defendants' time to answer has been extended pending the outcome of their motion.

### Defendants' Motion Under Rules 12(b)(6) and 56(b)

Defendants' motion raises, at the threshold of this litigation and before the expenditure of substantial time and cost in its prosecution and defense, the sole question of whether plaintiffs' claims are barred in their entirety by valid and enforceable releases. All plaintiffs reside abroad, similar claims and defenses arising from the sinking of the S/T Grand Zenith are pending in other actions filed in this District and, aside from matters concerning the alleged negligence of defendants and the unseaworthiness of the vessel, substantial discovery is otherwise anticipated on factual issues concerning the applicability of American law, the status of certain plaintiffs as legal representatives of the decedents and the scope and quantification of damages.

The Court has carefully reviewed the conclusory affidavits and exhibits submitted, the contentions of the parties and the legal arguments and authorities submitted by memoranda and letters of counsel. Although many material facts seem clearly to be uncontroverted or established, the Court on the limited and uncertain record before it, as set forth more fully below, cannot find in respect of all plaintiffs that the settlements were reached at arms' length, that plaintiffs knowingly released rights, if any, under American law and that defendants' agent did not fail, in fact, to clarify or make appropriate representations as to foreign law when he may have been under a duty to do so.

### A. Defendants' Contentions and Proof

Defendants have supplied the Court with copies of executed agreements, in both the Chinese and English languages, between a representative of "Zenith Navigation S.A. owners of S/T 'Grand Zenith'" and statutory heirs of the deceased crewmen [1] and receipts for payment pursuant to those agreements.

The agreements, prepared by defendant Zenith Navigation S.A.'s local Taiwan lawyer, are in form and substance identical for all material purposes and in no instance does it appear that a statutory heir separately negotiated the terms.

Each agreement contains a "whereas clause" which recites the loss of the vessel, refers to "negotiations and meetings held by the Chinese Seamen Association" and states that the parties reached agreement "according to the Revised Articles of Agreement for Definite Period as promulgated on July 26, 1976 by Ministry of Communication ((65) No. 06600 order)." [2]

The agreements then proceed to specify the amount of payments to be made to the

---

1. In fact, the moving affidavit has appended such agreements and receipts for only 14 of the 15 crewmen involved in this action. No agreement is appended with respect to Y.C. Yeh. In view of our disposition, however, we have assumed for the purposes of this motion that such an agreement exists and contains terms identical to those supplied as exhibits. We also assume that the individual or individuals signing the agreements had authority to bind other statutory heirs of the decedent.

2. No recital or mention is made expressly in the agreement as to the representation of the statutory heirs by counsel or the nature or extent of any information available to them concerning the possible applicability of or provisions for relief under American law.

statutory heirs "in accordance with the . . . Articles of Agreement"[3] for death, funeral expenses, donations, condolences, life insurance indemnities, year-end bonus allowances, maintenance, additional compensation and other indemnities. They next provide for the amounts thereunder to be paid into Court or to designated Chinese associations, for crewmen or the ship's master, if the heirs object or dispute the amount of payments or there is litigation. Then, the agreements set forth the release upon which defendants' motions are predicated:

"7. [The statutory heir] . . . agrees and acknowledge [sic], has remised released and forever discharged personnel [sic] or legal liabilities of Party A, [the representative of Zenith Navigation S.A.] its agents, servant, employees, underwriters, and guarantors of the S/T 'Grand Zenith', Zenith Navigation, S.A. Sea King Corporation, their servants and employees from any and all further demand, suit or suits, civil or criminal, claim or claims, all manner of action or actions cause or caused [sic] of action, including but not limited to court preservation, in or outside of the Republic of China after this agreement becomes effective."[4]

The agreements conclude by providing for the making of multiple copies, their distribution, and the primacy of the Chinese language version.[5] The formalities of execution include an endorsement by the District Court, Taiwan "that the Signature/Seal in this document is authentic."

Appended to the agreements are receipts by the statutory heirs, evidencing their receipt of the amounts set forth in the agreement. They also contain an "acknowledgement" by the heirs that the payment is "the total amount of compensation and indemnity" for the decedent, bear a District Court's attestation as to the authenticity of the heirs' Signature/Seal and contain an endorsement that the signing heir "should be fully responsible for any dispute or claim of rights arising between or among all the statutory heirs of the deceased crewmen and there will be no concern with your esteemed company." Finally, these receipts, unlike the agreements, are witnessed and signed by a Schelling Cheng, identified thereon only as "Attorney-at-law, International Business Law Office."

Defendants have supplied two affidavits of Schelling Cheng. It is his testimony that he practices law in Taiwan, that he represented defendant Zenith Navigation S.A. in negotiating settlements with the statutory heirs, that they "were relying upon the Seamen's Union to protect their rights," that the Union sponsored several meetings in which owners' offers were rejected and that, ultimately, settlements made were not based on decedents' actual agreements of employment but on a new, substantially higher salary scale to be incorporated in a form of agreement first to become effective after their death. He offers the conclusory opinion that "all families freely and willingly agreed to the proposal," that since settlements were signed between February 1977 and September 1977 there was no pressure to do so and, during this time, the families "could have obtained additional advice or changed their mind."

The Cheng affidavits also recite in general fashion that the settlements were approved by the District Court only after a notary, a court official in Taiwan, was satisfied as to the documentary proof of the relationship of the signing heir to the deceased and that the notarization "is the final act of a court proceeding whereby the court actually reviews the document and underlying act and officially approves the same." Mr. Cheng concludes, therefore, that the settlements, by virtue of District

---

3. A copy of the form of the Articles of Agreement was supplied to the Court.

4. Defendants argue that, even if plaintiffs had a claim under American law, this language should be given full effect and the claim be deemed extinguished or plaintiffs be barred by release or accord and satisfaction.

5. No claim is made by any party that the English version is not an accurate translation of the terms and substance of the Chinese version.

Court review, "became a judicial act of the government of the Republic of China." [6]

Ms. Mai Rong Chen, the office manager in Mr. Cheng's law firm, testified by affidavit submitted by the defendants that, after attending meetings for the heirs sponsored by the Seamen's Union, she contacted the families involved and had them "come to our office . . ., I would read the release in detail, explain it to them and have them sign it." Her affidavit does not set forth the substance of what she explained, either to any individual signatory or more generally. No mention is made, except in one instance, of whether she ascertained if the heirs or any of them had or wanted legal counsel or had received any information of possible claims under foreign (i. e., other than Chinese) law.

Ms. Chen's affidavit then recites that, after the release was signed, she went in each instance to court with the heirs where an application for a notary was completed and signed and then the court "would check all the documents to make sure they were actually heirs and asked them the following questions: (1) Have you read this document; (2) Do you understand it; (3) Is this your signature; and (4) Do you agree with the contents of this document." Further,

Ms. Chen's affidavit states that "when the court was satisfied that all was in order[,] they would notarize the release and approve it by sealing. By this point I would deliver the settlement check and deliver the release to the family in the presence of the court." [7]

Finally, Ms. Chen recites that while working on the case over several months, none of the families indicated to her they were under economic pressure nor did they request a "fast" payment. Indeed, she states, the wife of one of the seamen had given her a letter addressed "by attorney Chen" from which defendants infer the wife had knowledge of possible claims under American law, but the wife "was not interested." [8] The letter appears to have been sent to the family of decedent Ming by a Taiwan lawyer named Chen Da Ming. It purportedly recites that Da Ming had visited certain other decedents' families and was writing to those he could not personally visit; that he had been advised by a New York attorney of the possible family claims and that "the indemnity payment order by American courts for this type of case is higher than that of other countries." [9] Da Ming thus suggested that the family cooperate with the New York attorney to obtain consents from other families for handling this case. [10]

6. The legal significance of this statement and whether comity is to be given to such a judicial act by limiting the scope of this Court's inquiry into the validity of the releases was neither briefed nor argued; nor is there adequate factual predicate, despite plaintiffs' failure to controvert Mr. Chen's testimony, to ascertain the juridical facts as to the nature of the District Court, the extent to which its acts are subject to collateral attack, and other factual matters relevant in an analysis of comity and foreign law. No transcript or other record, if any, of proceedings before the District Court has been proffered.

7. Ms. Chen's affidavit does not recite what answers, if any, were given by the signatories or whether the District Court undertook to explain the releases. Moreover, affirmative answers by the heirs to the four questions is not necessarily inconsistent with plaintiffs' claims that the heirs did not understand there were claims available under American law.

8. Ms. Chen's affidavit does not purport to set forth the entire conversation between her and the unidentified wife. Moreover, Ms. Chen's

affidavit appears to be in error as to the letter's author. The letter was by a Taiwan attorney named Chen Da Ming. A copy of this single letter, in Chinese, is annexed with an uncertified English translation to an affidavit of Schelling Cheng.

9. The quoted advice does not expressly address the existence of claims under law other than Chinese or aside from claims under the Articles of Agreement. Plaintiffs here do not dispute the validity of the releases as to claims under Chinese law, or the fact that the settlement of such claims was at a sum higher than required by decedents employment agreements. Rather, the issues postured are whether the releases also covered rights, if any, under American law and, if so, whether the releases, under American law, are enforceable.

10. Defendants argue from this letter that its substance was communicated to each of the plaintiffs and, therefore, when they executed the releases, they freely, willfully and knowingly abandoned claims, if any, under American law. There is no evidence other than this docu-

Feng Ju-Peng signed the agreements in issue on behalf of Grand Zenith's owner. His affidavit, submitted by defendants, recites that he was the crew agent and representative of Zenith Navigation Corporation,[11] the owner of the Grand Zenith and Marine Manager of Hai Shang Enterprise (Taiwan) Ltd., the General Agent in Taiwan for Sea King Corporation which is the General Agent in the United States for Zenith Navigation Corporation. He states that families of the crew visited him regularly to find out what happened after receipt of news of the sinking of the Grand Zenith, what was being done to locate crewmen and what compensation they would receive if the vessel was not located. He states that he advised them they would be "compensated in accordance with the crew members contracts." At no time in his affidavit does he claim to have advised whether, in addition to rights under the crew members' contracts they may also have other or different or greater rights under American law. He does acknowledge that the families expressed concern that the ship owners would be getting more from their insurance carriers than would be paid to them but he denied that was so.

Mr. Ju-Peng testifies he negotiated with the Seamen's Union and points out that the union demanded that any settlement had to be based not on decedents' actual employment agreements, but on a new form of contract which had a higher wage scale and new labor insurance provisions.[12] He notes this was discussed at meetings of the Seamen's Union on January 27 and 28, 1977 where the new agreement was disseminated and where answers were given to "any questions that were asked." He notes that some of the family members were either military lawyers or worked in law offices

and that one wanted to know [and presumably asked in the presence of others] whether Panamanian law would be applied.[13]

Finally, Ju-Peng states that he was present when "the widow of the chief mate" gave Ms. Chen, the Manager of the International Business Law Office, and himself a copy of the letter from Attorney Chen Da Ming concerning the advice of the New York lawyer. In light of that letter, Ju-Peng baldly asserts that "all of the families were well aware they might have possible rights under American law prior to their agreement to the settlement of signing any releases" and he points out that they could have utilized Mr. Da Ming's services "if they so desired." He also concludes that "the families freely, willingly, on their own terms and with full understanding of what they were doing settled this matter with owners."

Based upon the foregoing affidavits, counsel for defendants argues that plaintiffs' claims were settled, monies paid and releases executed, all with the approval of the courts of the then Republic of China, that the families of the deceased seamen had counseling by the Seamen's Union, and the Advisory Committee to the Foreign Employment of Mariners, R.O.C., that they were apprised of the opportunity of hiring U.S. attorneys by Attorney Chen Da Ming who, by personal visit or letter advised as to the possibility of substantial rights for the families under American law; that in accordance with customary procedure the courts in China were satisfied that the families of the deceased seamen understood what they were signing; that the settlements were separately consummated over a considerable period of time; that they were

---

ment that such consents were obtained or that other letters were sent to or received by decedents' families.

11. The named defendant in this action is Zenith Navigation, S.A. Compare Cheng's affidavit which states that defendant Zenith Navigation *S.A.* was the owner.

12. The arguments, if any, made in support of this demand are not set forth in the affidavit.

13. Curiously, Ju-Peng's affidavit does not set forth the reply, if any, given to this question or the specific context in which the question as to Panamanian law was raised. There is, moreover, no indication in Mr. Ju-Peng's affidavit that any question as to American or other law was asked.

not only adequate, but the highest settlements ever obtained for families of Taiwanese seamen, the sum being four times the amount they would have been entitled to under Chinese Maritime Law.

## B. *Plaintiffs' Contentions and Proof*

Plaintiffs have provided English translations of minutes of meetings held under the auspices of the Seamen's Union in Taiwan on January 27 and Kaohsiung on January 28, 1977.[14] They show that, in addition to representatives of some of the decedents at each meeting,[15] officials of the Seamen's Union, the Chin Li Navigation Company, the Hsin Ju Navigation Co., The Ministry of Communication, Department of Navigation, The Assistance Committee for Seafaring Seamen and the Justice Department Bureau of Investigation attended both meetings. In Taiwan, the City Police also sent a representative. No lawyer is identified as being present on behalf of any attendee.

A review of the January 27, 1977 minutes reflects that the family members present brought up questions about when the ship sank, possible salvage of the ship, insurance for the crewmen, compensation to family members, funeral ceremonies and memorial services. Nothing further is recorded about the nature or substance of the questions. Replies were made by the representative of the shipping company, presumably Ju-Peng, who said that the company would issue a "list owing" and will take all steps necessary to effect payment. Statements made by officials in attendance are not recited. Finally, the minutes reflect the conclusion reached at the meeting that compensation would be made in accordance with the contract for employment promulgated by the Ministry of Communication on July 26, 1976

(the new employment contract). There is no indication that the issue of applicability of American law was raised.

The minutes of the meeting of January 28, 1977 at Kaohsiung, in addition to recording information similar to that in the minutes of January 27, also reflect questions as to supplementary payments and voyage bonuses. The recorded response of the shipowner was to assure payment in accordance with the new contract of employment, including salaries, voyage bonuses and supplementary payments. No reference is made in the minutes to a question under Panamanian law or the possibility that claims might exist, under Chinese or any other law, separate from rights under the decedents' employment contracts.

Plaintiffs also submit three affidavits, identical in all material respects, one each from a member of three of the fifteen families whose members are plaintiffs here.

The affidavits state, in part, that the family member affiant was at a Seamen's Union meeting where the "shipowners local agent advised us of rights under Chinese law"[16] and persuaded the affiant and representatives of other families "to sign releases." They categorically deny the affiant had any legal advice before signing the release and disclaim he was ever advised that he or other members of the family might have rights for greater damages under American law. They also recite that affiants are from a poor family, were "under great pressure to accept a settlement offered by the shipping company's local agent and attorney," were "in great need of money and had no hope of attaining more as the 'facts' were explained . . . .''

14. The translation of these minutes, which do not purport to be verbatim, is unsworn and the qualifications of the translator are not stated. Nonetheless, defendants do not interpose these objections.

15. The representatives, one listed per family, consisted variously of the decedent's mother, father, sister, brother, friend or fiance. In some cases, the signatory to the agreements relied upon to establish the existence of the releases by defendants is not identified as

present. In the case of representatives of decedent J.W. Wu, whose personal representative and family members are among the plaintiffs here, there is no indication that his family was represented at either meeting.

16. No claim is made in these affidavits that defendants, their agents, representatives or others involved in the settlement affirmatively misled the families in any way.

A further affidavit was submitted on behalf of plaintiffs by Stephen Chang who states he is an attorney admitted to practice in Taiwan and in the District of Columbia and had interviews with members of the families of the decedent plaintiffs' representatives in the spring of 1977. He states, in conclusory fashion, that they advised him no one had mentioned that substantial damages might be available to them under American law.

Finally, plaintiffs' counsel of record in this action, apparently based only on Mr. Chang's affidavit, refers to Mr. Chang's visit to Taiwan, the communications between Mr. Chang there and members of the decedents' families and sets forth conclusions as to the extent to which plaintiffs had knowledge of potential rights under American law. He also provides illustrations of two families which individually received payment of under $25,000 in the aggregate against the release although there was alleged lifetime loss of earnings in both instances in excess of $115,000 plus additional damages of over $50,000 attributed to "possible loss of consortium and service" for family members. The suggestion is that decedents' families received inadequate consideration for the release, if interpreted to apply to claims under American law.

Based on the foregoing, plaintiffs contend that they were never advised of the applicability of American law and had no legal counsel; the three family affiants' statements indicate "financial pressures leading to acceptance" of shipowners offers at an inadequate consideration, and it was only through Stephen Chang, retained after the signing of the releases, that plaintiffs learned of potential rights under American law. Therefore, plaintiffs argue they never had full disclosure of their rights and no intelligent decision by them to accept the settlement offer could have been made.

**C. Factual Issues Presented by the Parties**

Neither plaintiffs nor defendants have supplied consistent or convincing proof to permit this Court to resolve the major points of disagreement in factual contentions: [17]

  (a) whether plaintiffs knew or understood that there were possible rights under American law;

  (b) the extent to which Ju-Peng directly or indirectly made or permitted to be made representations as to the availability of claims under foreign law; and

  (c) the arm's length nature of the settlement.

At the outset, the Court rejects defendants' claim that Da Ming's letter satisfactorily establishes that plaintiffs all had legal advice, or an opportunity that was rejected to have legal advice, concerning the possible claims and benefits under American law. By its terms, the letter refers only to "the indemnity payment ordered by American courts" as being "higher than that in other countries" and there is no identification or explanation of decedents' possible rights under American law, the types of "indemnity" available and whether the measure of any damages would necessarily be controlled by contractual indemnities. There is, moreover, no evidence that any plaintiff, except one, ever received the letter or read it, or that Da Ming visited or obtained consents from other plaintiffs. Further, Ms. Chen's recital of her discussion with the single recipient of the letter is incomplete and conclusory.

Plaintiffs, however, were clearly able to obtain and supply denials of receipt of the letter or of meetings with Da Ming and they have failed to do so. Ordinarily, such failure should preclude their arguments made from the face of the letter alone, and weigh heavily against them on a summary judgment motion which calls upon parties

17. Plaintiffs do not challenge the existence of the agreements, the releases therein, the adequacy of the language in the release to cover "all claims" including claims under American law, the "approval" of the agreements by the District Court in China and the payments to plaintiffs at a rate four times higher than required by Chinese Maritime Law only after "bargaining" under the auspices of the Seamen's Union.

to come forward with evidentiary matter, not just counsel's conclusions. Indeed, the three plaintiffs' affidavits do not even address the Da Ming letter.

Nonetheless, the three plaintiffs' affidavits do clearly put in factual contention, by barely acceptable conclusory assertions, that they had no knowledge or advice concerning the possibility of a claim under American law. Their assertion is important because Ju-Peng, who acted for defendants at the Seamen's Union meetings, carefully testifies that he explained to plaintiffs that "the owner would compensate them in accordance with the terms of the crewmembers contracts" and the Seamen's Union minutes reflect only that efforts would be made to improve upon the terms of those contracts under new standards applicable to Chinese crewmen. Further, Ju-Peng, who affirms that a question was raised as to Panamanian law at a Seamen's Union meeting (although it is not reflected in the minutes thereof) fails to provide the Court in his testimony with the context of the question, the discussion held, or the answer given in his presence.

The Court views Ju-Peng's failure to set forth the scope of the discussion of Panamanian law and the conclusory nature of defendants' other supporting affidavits as being of significance, regardless of the legal analysis of which parties bear the ultimate burden of proof as to the validity of the releases. The context of the discussion of foreign law may affect the factual analysis as to plaintiffs' conduct after the Seamen's Union meetings and suggest whether any representation as to foreign law, in Ju-Peng's presence, gave rise to a duty to clarify the representation or make other disclosure. Moreover, as clearly appears from the affidavits of Schelling Cheng and Ms. M. Chen, at no time did they have contact with any lawyer for plaintiffs and they undertook themselves to provide an unspecified explanation of the releases to each of the plaintiffs' representatives.

The Court, inexplicably, has not been satisfactorily supplied by any party, with sufficient relevant facts, convincingly set forth, about the arm's length nature of the negotiations, either at the Seamen's Union meetings or thereafter. Absent entirely is any meaningful recitation of who said what to whom, among the parties, about the meaning of the release and the possible foreign rights incorporated in the settlement agreement, obviously a document of adhesion. The families, it will be recalled, were instructed one by one in the absence of any counsel of their own or Union advisors at the law offices of defendants by a nonlawyer office manager ready to make payment for their loss,[18] or withhold it if agreement were not reached.

### Legal Analysis

#### 1. Defendants' Rule 12(b)(6) Motion

Defendants' motion under Rule 12(b)(6) raises the question whether plaintiffs have stated a claim on which relief can be granted without pleading avoidance of the release, even though release, generally, is a matter of affirmative defense. F.R.Civ.P., 28 U.S.C. Rule 8(c).

On the incomplete factual record here, and in the absence of information as to each of the plaintiffs, we are not prepared to conclude that the defendants do not have the obligations both to plead and prove the validity of the release. Since the parties have not separately briefed or argued the pleading point, the complaint sufficiently pleads the applicability of American law and the issues may be crystallized by the answer and a pre-trial order, the Rule 12(b)(6) motion is accordingly denied. Compare *Neeff v. Emery Transportation Co.,* 284 F.2d 432 (2d Cir. 1960).

#### 2. Defendants' Rule 56 Motion

Plaintiffs seek the benefit of the traditional rule of American law that a seaman's release is "subject to careful scrutiny" and

---

**18.** In view of these paramount deficiencies on central factual questions, we do not further address the specific additional evidentiary arguments raised by the parties or analyze the inferences they would have us draw.

the party relying thereon has the burden of proving that the release "was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. . . . "[19] If this standard applied, defendants' motion would clearly be denied on the merits since their own moving papers alone raise factual issues about the circumstances under which the releases were given and the extent of understanding of the plaintiffs as to possible rights under American law.

Defendants vigorously oppose the applicability of the traditional protections applicable to seamen's releases and press the claim that plaintiffs have the burden to prove the invalidity of the releases, relying primarily on District Judge Richard Owen's recent thoughtful and well-researched opinions in *Ying Shiue Jyu Fen v. Sanko Kisen (U.S.A.) Corp.,* unreported memorandum and order filed May 7, 1977, Docket 75 Civ. 2153, page 12, note 12 (S.D.N.Y.); *In re Lampsis Navigation Ltd.,* unreported memorandum and order filed September 5, 1978, Docket 76 Civ. 2564, page 2 (S.D.N.Y.). (". . . the rationale underlying the special solicitude shown seamen in this regard is not applicable to the legal representatives of deceased seamen . . .").[20]

■ At this stage of the proceedings, before discovery reveals facts justifying the applicability of American law, decision of this issue as it concerns family members of decedents as well as their legal representatives is premature and unnecessary to the disposition of the Rule 56 motion. This is so because neither plaintiffs nor defendants have satisfied the Court as to the material ultimate facts even though, on the record here, the burden of coming forward has decidedly shifted to plaintiffs. The conclu-

sory nature of plaintiffs' incomplete proof, the broad inferences from fragmentary facts in affidavits each party is asking the Court to adopt, the legal questions presented, and the Court's uncertainty with the surface contentions in defendants' affidavits raise genuine issues of material fact and make summary judgment particularly inappropriate. 10 Wright and Miller, Federal Practice and Procedure, § 2727 at 524–526 (1973); *American Mfgs. Mut. Ins. Co. v. American Broadcasting—Paramount Theatres, Inc.,* 388 F.2d 272 (2d Cir. 1967); *Sagastume v. Lampsis Navigation Ltd.,* 579 F.2d 222 (2d Cir. 1978) (seamen's release).

Plaintiffs move prior to answer for an order permitting discovery and inspection of defendants' corporate books and directing the depositions of Chin Yu Hsu, also known as James Y.S. Chen.

■ In view of the jurisdictional claims made, the clear evidence from the affidavits of Ju-Peng and plaintiffs' counsel that plaintiffs have an adequate basis to believe they can prove applicability of American law (and its standards as to the validity of releases) after discovery,[21] and the dispositive nature of a contrary conclusion, plaintiffs' motion is granted. Plaintiffs, therefore have leave to serve and file, upon entry of this order, discovery demands in the limited areas requested under Rules 33 and 34, F.R.Civ.P. and to notice, prior to answer, the deposition of Chin Yu Hsu.

### Conclusion

The foregoing constitutes this Court's findings of fact and conclusions of law in accordance with Rule 52, F.R.Civ.P.

Plaintiffs' motion for discovery is granted.

**19.** *Garrett v. Moore-McCormack Co., Inc.,* 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239 (1942); *Kelcey v. Tankers Co.,* 217 F.2d 541 (2d Cir. 1954).

**20.** See *Capotorto v. Compania Sud Americana de Vapores, Chilean Line, Inc.,* 541 F.2d 985 (2d Cir. 1976) (longshoreman's releases are not to be judged by rules applicable to seaman); compare *Matter of Industrial Transportation Corp.,* 344 F.Supp. 1311 (E.D.N.Y.1972) (indicating

the benefits under the Jones Act should, as a matter of remedial legislative policy, extend to beneficiaries and dependents of seamen).

**21.** See Affidavit of Paul S. Edelman dated October 28, 1977; the Affidavit of Stephen Chang dated October 27, 1977 and the findings, although not controlling here, in *Coastal Trading, Inc. v. Zenith Navigation S.A., et al.,* 446 F. 330 (S.D.N.Y.1978).

Defendants' motion for summary judgment under Rule 56, F.R.Civ.P. and for dismissal under Rule 12(b)(6) is denied.

SO ORDERED.