GRISBAUM, Judge.
This appeal arises out of a personal injury claim. The plaintiff, Mr. Jewel Carpenter, while in the employ of Celotex Corp., accidentally splashed himself with an industrial solvent (composed primarily of 1-1-1 trichloroethane) used by the electricians to degrease parts and clean electrical contacts. Within a year of the accident, he found himself blind and is now seeking tort/products liability recovery from the bulk manufacturers of the solvent and the wholesale and consumer distributors. After a lengthy trial on the merits before a *422 jury, his demands were rejected, and he now appeals. We set aside the judgment of the trial court and remand the matter for a new trial.
We are called upon to determine whether a number of evidentiary rulings constituted an abuse of discretion with respect to qualification of experts and the reception of their expert opinion into evidence. The general rule is set out by Jennings v. Allstate Ins. Co., 273 So.2d 534, 536 (La.App. 1st Cir.1973), quoting Judge (subsequently Justice) Tate in Carvell v. Winn, 154 So.2d 788, 791 (La.App. 3d Cir.1963), writ denied, 245 La. 61, 156 So.2d 603 (La.1963) as follows:
[Wjhether or not a witness meets the qualifications to testify as an expert is largely within the discretion of the trial judge. In our opinion, it is also largely within the discretion of the trial judge to determine the competency of expert witnesses to testify to specialized areas on inquiry not necessarily within ... [their] general competency to give an opinion as an expert, or at least not shown to be so by the facts of the record. That is, the trial court is not under a mandatory duty to permit an expert witness to testify to any matter upon which the expert himself says he is qualified to given an expert opinion; the court must have some discretion to limit the witness’s testimony as an expert to the actual field of his expertise and as applicable to the facts of the particular litigation, then before it (subject of course to a showing that the court abused its discretion in this regard, State v. Carter, 217 La. 547, 46 So.2d 897 [ (La.1950) ].) [sic]
“Thus referring to the ability of a witness to testify as an expert based upon his ‘experiential capacity’, [sic] Dean Wigmore noted that ‘The capacity is in every case a relative one, i.e., relative to the topic about which the person is asked to make the statement * * *. His fitness, then, is a fitness to answer on that point. He may be fitted to answer about countless other matters, but that does not justify accepting his views in the matter in hand.' 2 Wigmore on Evidence (3rd ed., 1940), Section 555(1) at p. 634.
‘In most jurisdictions it is repeatedly declared that the decision upon the experiential qualifications of witnesses should be left to the determination of the trial court’, [sic] referring to ‘the fact of the possession of the required qualification by a particular witness.’ Ibid, Section 561, p. 641. Cf. LSA-R.S. 15:466; State v. Mills, 229 La. 758, 86 So.2d 895 [ (La.1956) ] (syllabus 8).”
The question, therefore, narrows itself to whether the trial judge abused his discretion in maintaining the defense’s objections, thus preventing the expert from expressing his opinion as to why the accident happened.
The specific rulings herein give rise to the following issues:
(1) Whether, where two treating ophthalmologists seek to testify as to a possible cause of the plaintiff’s medical condition (blindness), such testimony is inadmissible as not being rendered in terms of a reasonable medical certainty or, at least, a probability, and
(2) Whether a medical expert may premise part of his testimony on the reported data of researchers who are not themselves available to testify and whether, on the present record, Dr. Alexander demonstrated “no experience” with respect to the question of causation so as to preclude the reception of his opinion.
ANALYSIS-ISSUE ONE
Our jurisprudence provides certain directives for proof of causation by a tort plaintiff. The Fourth Circuit in Morales v. Houston Fire and Casualty Co., Inc., 342 So.2d 1248, 1250 (La.App. 4th Cir.1977), writ denied, 345 So.2d 49 (La.1977) stated that “[c]ausation, ... like any other fact, need not be proved by direct evidence and may be shown by circumstantial evidence. The ultimate question is the preponderance of all evidence.” The Second Circuit in IMC Exploration Co. v. Henderson, 419 So.2d 490, 495 (La.App. 2d Cir.1982), writs denied, 423 So.2d 1149, 1150 (La.1982), quoting Braud v. Kinchen, 310 So.2d 657 (La.App. 1st Cir.1975), succinctly defined a *423 preponderance of the evidence to mean “ ‘evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not.’ ” That court went on to state, “[P]roof that something is possible is of little probative value as to an ultimate issues of fact unless it is established with reasonable certainty that all other alternatives are impossible.” IMC Exploration at 495 (emphasis supplied), citing Lutheran Church of the Good Shepherd of Baton Rouge v. Canfield, 283 So.2d 331 (La.App. 1st Cir.1970), writ denied, 256 La. 360, 236 So.2d 497 (La.1970). The First Circuit in Johnson v. Wilson, 97 So.2d 674, 682 (La.App. 1st Cir.1957), aff'd in part and rev’d in part, 239 La. 390, 118 So.2d 450 (La.1960), concluded that medical testimony as to a “ ‘definite possibility’ ” of the existence of a condition, although it does not meet the alleged test of proving something with a reasonable certainty, nonetheless goes to the weight rather than to the admissibility of the evidence, the preponderance standard applying to the plaintiff’s whole case, not to its constituent pieces. See also the rationale of Robertson v. Douglas Steamship Co., 510 F.2d 829 (5th Cir.1975) at 833-34, en banc reh’g denied, 515 F.2d 510 (5th Cir.1975).
The record shows Dr. Ralph Nix, an ophthalmologist specializing in diseases and surgery of the retina, was accepted by the court as an expert in ophthalmology. His records indicate that, beginning March 23,1978, he saw Mr. Carpenter on consultation from Dr. Moel, who had been the plaintiff’s treating eye physician. Dr. Nix saw the plaintiff in response to complaints of blurred vision in his right eye for the previous three days. Carpenter explained that in March of 1977 he had splashed “trichlo-roethylene” in his left eye. Upon testing, Dr. Nix concluded that vision in the right eye was 20/70 with correction and the left eye could perceive light projection only (i.e., light and the direction from which it was projected). He found evidence that the central retinal vein of the right eye was obstructed and that “the nerve in back of the eye was severely swollen.” The left eye “showed evidence of an old central retinal vein occlusion.”
Because he did not consider that “this was ... primarily an eye disease, but possibly a systemic disease or a neurological disease that caused the vein to be obstructed secondary to the primary disease,” Dr. Nix ordered hospitalization and tests, which were done in late March 1978. Despite Dr. Nix’ efforts, “There was a gradual deterioration of the condition in the right eye,” with evidence of total occlusion of the central retinal vein appearing. Dr. Nix diagnosed a central retinal vein occlusion. As to causation, he observed, “it is still my feeling that it is not ... primarily an eye disease but it is secondary to something else. I have not reached a conclusion ... as to what the specific ... medical disease is, or neurological disease.”
On cross-examination, Dr. Nix says the plaintiff told him he did not splash any chemical in his right eye. In the right eye, Dr. Nix found some evidence of arteriosclerosis, the most common cause of central retinal vein occlusion. Dr. Nix found no evidence of ulceration of the cornea or of any direct penetration through the cornea of the left eye. He clarifies his conclusion as to causation by stating, “my conclusion was that it was the swelling of the optic nerve that compressed the central retinal vein to the extent of causing ... it to obstruct.” Dr. Nix concedes that many cases of central retinal vein occlusion arise from unknown cause. He went on to state that he commonly sees central retinal vein occlusions in his practice; however, “it’s not commonly seen in both eyes.” It usually occurs suddenly. As to whether chemical fumes could affect the optic nerve, he states, “It’s in the realm of possibility but I’ve never seen it.”
On redirect, counsel for the plaintiff asks how an internal accumulation of chemical or a drug could affect the optic nerve. However, upon defense’s objection, Dr. Nix is not allowed to answer because the court is of the opinion that the applicable criterion is “probability, to a degree of medical certainty.” Dr. Nix suspects Mr. Carpen *424 ter’s problem may be connected to arteriosclerosis, but this conclusion is reached primarily because he can isolate no other cause. The doctor repeats that, in the last analysis, the cause is unknown. When asked if a fat-soluble chemical can penetrate and proceed through the cornea, Dr. Nix replies, “Theoretically it could.” He found no evidence of this having occurred, however.
In the context of further causation testimony, the record reflects the reading of the deposition of Dr. Steven A. Moel, who was plaintiffs first treating eye physician. The doctor is asked whether he has conducted any research into the relationship between the plaintiff’s condition and 1-1-1 trichloro-ethane, to which query he responds in the affirmative. He says he has researched the literature to some extent and also has spoken to persons having some experience with halogenated hydrocarbons. Dr. Moel says it is his personal practice to do such research when he encounters new or unusual medical problems. The doctor points out he has had some training in chemistry and toxicity. He also has treated patients with chemical injuries to the eyes. When asked how chlorinated hydrocarbons, particularly 1-1-1 trichloroethane, can be absorbed into the body, he responds, “The absorption and route of entry into the body can be through fumes or it goes through the lungs and is absorbed into the blood stream [sic] and into the fat cells in particular. After exposure it can also go through the skin and pass through in that way.” He adds, “There are several articles pointing to this group of chemicals causing both inflammation and venous stasis [i.e., slowing of blood flow].” The court, however, disallows the possible application of such findings to the instant problem, ruling that a possibility is not the criterion to be used. The court also notes that the doctor never gives a cause “within a reasonable degree of medical certainty.”
From our view of the thrust of Dr. Moel’s and Dr. Nix’ testimony, which was excluded by the trial court, we find their expert testimony as ophthalmologists amply demonstrates that the direct cause and/or probable cause of Mr. Carpenter’s retinal vein occlusion was basically unknown. Moreover, both Dr. Moel and Dr. Nix, through their testimony, and with reasonable medical certainty, negated the operation of numerous potential causes other than the accident of Mr. Carpenter’s blindness. Under this factual scenario, the trial judge’s rationale that a possibility is not the correct criterion and his concluding that the doctor never gives a cause within a reasonable certainty is not correct in light of our jurisprudential directives. Accordingly, the trial court abused its discretion.
ANALYSIS — ISSUE TWO
We now turn to determine whether the trial court abused its discretion in not allowing certain aspects of Dr. Alexander’s testimony on behalf of the plaintiff. His background consists of an M.S. in medical science from Rutgers, an M.S. in public health and an M.S. in industrial hygiene engineering from the Harvard School of Public Health, and an M.D. degree from Washington University Medical School in St. Louis. For four years he served as a senior medical officer for the Federal Occupational Safety and Health Administration. He further served on various toxicology panels in the federal government. Beginning in 1984, he entered private practice in occupational medicine and toxicology. He is board-certified by the American Board of Preventive Medicine. He explains that “occupational medicine is the diagnosis, treatment and prevention of occupationally related illnesses and injuries” and adds, “In my particular case ..., that’s primarily with respect to chemical exposures.” Incongruously, Dr. Alexander also has been convicted of robbing a bank. The conviction, as of the time of trial, was on appeal.
On cross-examination on his credentials, Dr. Alexander says he is not an ophthalmologist nor an expert in diseases of the eye. He also states that “Central retinal vein occlusion is a rare disease and I had not previously seen such a case.” He is not an expert in chemistry but has had training in chemistry to a level one would expect in a physician. Dr. Alexander was *425 accepted as an expert in occupational medicine.
On direct examination on the merits, Dr. Alexander says he saw Mr. Carpenter in November 1984 and conducted an extended interview with him. He reviewed medical records and information concerning the job-site and agrees that the plaintiff suffers from “bilateral retinal vein occlusion with secondary glaucoma leading to blindness.” He states that “After reviewing the records and seeing Mr. Carpenter and ... consulting with ... standard sources of literature in toxicology and occupational medicine and ophthalmology, I did arrive at a medical opinion with respect to ... Mr. Carpenter’s condition and it’s [sic] cause to a reasonable degree of medical certainty.” At this point the defense objects, maintaining that the opinion is predicated on hearsay articles. The court sustains the objection, stating that Dr. Alexander is not an expert in ophthalmology, toxicology, or chemistry. The court, after protracted argument and notwithstanding plaintiff’s counsel’s contention that Dr. Alexander is the precise expert to render an opinion on causation, rules as follows: “I think Dr. Alexander’s statement is based upon his own library research and he has had no experience either[;] therefore[,] I’m going to rule that he doesn’t have the ability to give an opinion of this particular question.”
The plaintiff’s counsel then proffers the following testimony of Dr. Alexander:
Q. Doctor do you have an opinion within a reasonable degree of medical certainty of whether Mr. Carpenter’s Occupational exposure to 1,1,1-Trichloro-ethane ... in it’s [sic] commercial form is related to his double retinal vein occlusion?
A. Yes sir, I do.
Q. And what is that opinion[,] Doctor?
A. Uh, to a reasonable degree of medical certainty, more probably than not, Mr. Carpenter’s occupational exposure at Celotex lasting some fifteen months under poorly protected working conditions to a safety solvent containing primarily 1,1,1-Trichloroethane, with it’s [sic] usual commercial contaminants and trace products is a direct and substantial cause of the subsequent development of his illness, which is to say a bilateral retinal vein occlusion, with secondary glaucoma and subseqeunt blindness.
On cross-examination on the proffer, Dr. Alexander says he has not participated in any of the experimental data with respect to the case. He adds that his opinion is premised not only on the articles of the others but also on his own professional experience. He has previously read thousands of articles with respect to the toxicology of petroleum hydrocarbons, chlorinated solvents, and other related chemicals. He has also examined “several thousand workers with occupationally related injuries and illnesses.” He cites also Mr. Carpenter’s “unacceptable” working conditions. He concludes:
The primary purpose ... of my mentioning them was that they would allow a large surface area for evaporation of a highly volatile solvent ... noted for its quick drying and rapid evaporation, so that, ... in poorly controlled working conditions such as Mr. Carpenter experienced, he would have had a routine increased, excessive opportunity for inhaling the fumes of this solvent which represented a major source of exposure along with uncontrolled, inappropriate body contact.
[[Image here]]
Plaintiff’s working conditions, he adds, “provided the means for an overexposure to the compound.” Dr. Alexander also finds significant that first one eye and then, a few months later, the other eye fell victim to the same problem.
On redirect on the proffer, Dr. Alexander, citing various studies, says he would expect trichloroethane and trichloroethy-lene to produce the same intermediate chemicals upon entering the human body and that these intermediate compounds, in turn, produce toxic effects. He also cites “twenty-one scientific papers published from 1916 to 1970, ... where there were observed various kinds of toxicity, reduced visual acuity, ... and partial or complete *426 blindness from exposure to Trichloroethy-lene.” He reiterates, “my point of view as an Occupational Medicine Specialist is one of the bases on which I am comfortable in arriving at a medical opinion that the exposures Mr. Carpenter experienced at work are reasonably and causally related to the subsequent development of his illness.” At the close of this proffered testimony the plaintiff rests.
From our view of the proffered testimony of Dr. Alexander, we find it appropriate to adopt the rule concerning live expert testimony premised on the reports of others as defined in Wigmore on Evidence. Under this rationale, an expert seeking to premise his testimony on the reported work of others not present to testify must demonstrate the following:
(a) a professional experience, giving the witness a knowledge of the trustworthy authorities and the proper source of information, (b) an extent of personal observation in the general subject, enabling him to estimate the general plausability, or probability of soundness, of the views expressed, [and] (c) the impossibility of obtaining information on the particular technical detail except through reported data in part or entirely.
J. Wigmore, Evidence in Trials at Common Law § 665b(3) (revised by J. Chadbourn, 1979). See also McCormick on Evidence, 899-901 (E. Cleary, ed., 3d ed., 1984).[1]
The record shows that Dr. Alexander possessed masters degrees in both industrial hygiene engineering and public health, has a medical degree, and is engaged in a practice focusing on occupational medicine and toxicology. He was received by the court as an expert in the field of occupational medicine. By his own definition given before being deemed an expert, “occupational medicine is the diagnosis, treatment and prevention of occupationally related illnesses and injuries.” Given these facts, it appears beyond quibble that Dr. Alexander is a well-educated health professional with some experience in and knowledge of the authorities in his field. Thus, the first, requisite is demonstrated.
As to his realm of observation in the general subject, he reports his particular area of interest is chemical exposure. It is uncontroverted that he has had, in his own words, “substantial professional experience in the areas of toxicology as they relate to occupational medicine, toxicology of industrial exposures, regulatory toxicology as it applies to Federal regulation of chemical exposures and ... the conduct and evaluation of toxicology studies ... in humans and animals.” Although he has never before dealt with a case of central retinal vein occlusion, he has had experience with the family of chlorinated hydrocarbons, including degreasing solvents. He has also seen patients concerning “splash and superficial burns of the eye ... related to this group of chlorinated solvents.” While the trial court was adamant that Dr. Alexander is neither a chemist nor an ophthalmologist, it is nonetheless clear that he has a degree of personal observation in his general subject such that he would be able to assess the views expressed in the literature pertinent to his field. Moreover, he directly testified that the articles he consulted were of a type reasonably relied on by experts in his *427 field on a daily basis, is present. The second requisite
Finally, as to the necessity of reliance on reported data, Dr. Alexander sought to rely on reports of incidents occurring over the course of several decades and appearing in various languages. By his testimony, central retinal vein occlusion is a rare affliction; it would seem to follow that its appearing in conjunction with chemical exposure must be rarer still. Given the impossibility of intentionally exposing workers to excessive amounts of 1-1-1 trichloroethane in order to obtain data and observing the diverse nature of such case reports as do exist and are sought to be relied on by the doctor, we see little opportunity for any one person to specialize firsthand in trichlo-roethane-induced blindness. To rely on the reports of others thus appears necessary.
Accordingly, we find the trial court erred in disallowing Dr. Alexander to render an opinion as to causation because of his reliance on the published reports of other researchers. Moreover, regarding the court’s remark that Dr. Alexander lacked experience, it appears utterly without foundation from the record facts before us.
In light of our determinations, we preter-mit addressing the remaining issues and set aside the judgment of the trial court and remand the matter for a new (jury) trial. Each party is to bear its costs of this appeal.
SET ASIDE AND REMANDED.
WICKER, J., dissenting with written reasons.

. Toups v. Sears Roebuck and Co., Inc., 499 So.2d 344, 347 (La.App. 4th Cir.1986), rev’d, 507 So.2d 809 (La.1987) assumes that a learned treatise exception to the hearsay rule exists in Louisiana. Here, what is at issue is not the learned treatise exception to the hearsay rule as such but the broader question of expert testimony based on the reported works of others. Although the applicable hearsay policies are similar, they are not precisely the same. Rather, the present situation involves fewer evidentiary pitfalls in that there is a live expert available for cross-examination on the opinions rendered. It is, thus, the situation more amenable to a construction favoring reception of the offered evidence. The Proposed Louisiana Code of Evidence likewise distinguishes the two situations and treats the live testimony more liberally, taking the position that the data on which an expert relies need not themselves be admissible into evidence in order for the expert to base an opinion or inference thereon. The data need only be “of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.” Art. 703. The learned treatise exception to the hearsay rule is defined in art. 803(18).