**In the Matter of the Complaint of EASTERN SHORE DIVING AND MARINE SERVICES, INC., as Owner of the TUG LADY JANICE for Exoneration from or Limitation of Liability.**

Civ. A. No. 2:93cv707.

United States District Court,
E.D. Virginia,
Norfolk Division.

March 2, 1994.

---

R. Arthur Jett and Carter B.S. Furr, Norfolk, VA, for petitioner.

Guilford D. Ware, Melanie Fix, Henry P. Bouffard and Jesse M. Suit, III, Norfolk, VA, for respondent.

## MEMORANDUM OPINION AND ORDER

JACKSON, District Judge.

### I. INTRODUCTION

Eastern Shore Diving and Marine Services, Inc. ("Eastern Shore"), owner of the tug Lady Janice, filed a Complaint for Exoneration from or Limitation of Liability resulting from the sinking of the fishing vessel F/V Carolina Dream which occurred on November 20, 1992. Respondents to the action are Samuel Moreno ("Moreno"), a fisherman who claims to have been injured in the accident, Carolina Dream, Inc. ("Carolina Dream"), the owner of F/V Carolina Dream, and Marinex Construction Company, Inc. ("Marinex"), owner of a flotilla which may, along with several of the other parties, have been responsible for causing the accident in question.[1] The focus of the matter currently before the court involves claims filed by Moreno against Carolina Dream and Marinex for personal injuries he suffered as a result of the accident. In response to these claims, Marinex filed a motion for summary judgment asserting that Moreno is barred from bringing these claims as a result of a release he signed following the November 20, 1992 accident. This motion, which has been joined by Carolina Dream and Eastern Shore, is ripe for determination.

### II. FACTS

On November 20, 1992, between the hours of 2:30 a.m. and 3:30 a.m., the fishing vessel F/V Carolina Dream struck an object in the Chesapeake Bay and began to sink. Moreno, a fisherman with a ninth grade education, was working on the boat and returning from an 18 day fishing trip at the time of the

---

1. The F/V Carolina Dream struck an unidentified object, causing it to sink. The unidentified object may have been remnants from an accident occurring in the same waterway one day earlier, involving the tug Lady Janice and a flotilla owned by Marinex. The Lady Janice was apparently helping to move Marinex's flotilla when the accident occurred, allegedly causing equipment from the flotilla to fall into the water.

accident. Shortly after the vessel began to sink, the Coast Guard arrived and rescued the entire crew, taking them to the offices of Carolina Dream and Wells Scallop Company in Seaford, Virginia.

The crew arrived at the offices at approximately 9:00 a.m. William Wells, Carolina Dream's president, and Philip Davey, counsel for Carolina Dream and Wells Scallop Company, discussed the accident and settlement of claims with the crew members and retained a transcription of the statements made by all parties. Moreno's testimony was given on November 20, 1992, lasting from 3:00 p.m. until 3:18 p.m. and from 5:40 p.m. until 5:47 p.m. Moreno, who had not slept since the accident and who received no more than 5 hours of sleep during the past 39 hours,[2] reported on three different occasions that he was not hurt. Moreno Statement at 18, 20. He stated that the collision "didn't jar me to the ground. It just kind of did me like a pinball machine." Moreno Statement at 7.

Davey and Moreno discussed the signing of a release. Davey advised Moreno, who had previously filed an unrelated workers' compensation claim, that he was entitled to consult with an attorney and that he might be able to recover his unearned wages and his expenses for any medical needs relating to the accident. Davey also told Moreno that by signing the release, he would be precluded from bringing any legal action relating to the accident.[3] Moreno, who again reported that he was not injured and stated that he did not envision any related future medical expenses, signed the release, despite acknowledging that "My father-in-law, he's a lawyer.... See, if he was here he'd tell me right now not to sign the paper unless I talked to a lawyer, but I see no reason why not." *Id.* at 22–24.[4]

The form release, which is partially written in Moreno's handwriting, states in pertinent part:

[I] do hereby release and forever discharge Carolina Dream, Inc., Wells Scallop Co; William S. Wells, III; and any other person or entity ... from each and every right and claim which I now have, or may hereafter have on account of injuries and illnesses suffered by me as follows: the sinking of the Carolina Dream on November 20, 1992 I was not hurt in any way and, in addition to that I release them from each and every right and claim which I now have or may hereafter have because of any matter or thing which happened before the signing of this paper, it being my intention by the signing of this paper to wipe the slate clean as between myself and the parties released, even as respects inju-

---

2. During the statement, Moreno frequently noted that he was tired. Moreno statement at 3, 24, 25.

3. The following exchange took place between the parties:

Q: ... The other thing that we're here to do is to take care of settling up any claim that you might have arising out of the sinking of the Carolina Dream. First of all, let me tell you that, as a seaman, you're entitled to have your own lawyer, to seek his advice and to decide— to get independent advice about how to settle. We've reached a base agreement. Do you choose to get your own lawyer to advise you or do you choose to go ahead with the settlement? I'm going to explain this to you step by step, but that's up to you.
A: I don't see no reason for a lawyer.
Q: ... nobody was hurt getting off the boat on to a Coast Guard cutter?
A: That's right.
Q: As a seaman, if somebody on board the boat had been negligent, causing it to sink or if the boat was unseaworthy, causing it to sink, and if you were hurt as a result of the sinking,
you might have some rights, first of all, to your unearned wages, which is the catch at the end of the voyage, which we're paying you; you would have a right, if you were sick or injured, to have your medical expenses paid by a doctor. You haven't gone to a doctor as a result of the sinking?
A: No.
Q: And you see no reason to expect that you're going to have any medical expenses, do you?
A: No.
Q: The reason I'm going through this is because when you sign this release—
A: I know, its a release.
Q: —you're giving up all rights you have out of the sinking of the Carolina Dream.
A: Yeah. My father-in-law, he's a lawyer.... See, if he was here he'd tell me right now not to sign the paper unless I talked to a lawyer, but I see no reason why not.
*Id.* at 19–20, 22–24.

4. During oral argument, counsel indicated that Moreno's father-in-law was not a lawyer, but instead was an employee at a law firm.

ries, illnesses, rights and claims not mentioned herein or not known to me.

Marinex exhibit 3.

In consideration for signing the release, Moreno was paid approximately $3,500, the balance of which he collected several days after signing the document. All parties agree that the sum may be broken down as follows:

$1,248.60  unearned wages
2,247.00  personal property lost
250.00  hardship

In deposition testimony taken nearly one year after the signing of the release, Moreno stated that he was sore following the accident and had collided with a number of ice boxes on board when tossed about the galley. *See* Moreno Deposition at 26. Moreno stated in his affidavit that two doctors diagnosed him as having a herniated disk, presumably resulting from the accident. Moreno Affidavit, at 12. Moreno also stated that, at the time he signed the release, he was told not to discuss the matter with other parties and was under the impression he had to settle in order to receive his lost earnings and his reimbursement for lost property. Moreno Aff. at ¶ 11, 14, 18. Moreno further stated that by signing the release, he understood he would be guaranteed future employment with Carolina Dream despite the fact no such promise appears in the document.

### III. STANDARD

■ Rule 56(c) provides that a moving party is entitled to summary judgment "if the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment is initially responsible for identifying those portions of the factual record which it believes establish that there are no genuine issues of material fact. Once the moving party has made this showing, the opposing

party must demonstrate, by reference to affidavits, depositions, answers to interrogatories, or admissions, that a triable issue of fact exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### IV. DISCUSSION

■ The court must determine whether there is a genuine issue of material fact regarding the enforceability of the release. If the court determines there is no genuine issue of material fact regarding the release's validity, Moreno will be barred from recovering any damages against the parties in this action.[5] If, however, the court reaches an opposite conclusion, Moreno may proceed with his personal injury claims. Federal common law guides the court in reaching this decision. *See Gamewell Manufacturing, Inc. v. HVAC Supply, Inc.,* 715 F.2d 112, 115 (4th Cir.1983); *Coleson v. Inspector General of Dept. of Defense,* 721 F.Supp. 763, 767 (E.D.Va.1989).

Moreno raises two arguments in asserting that there is a genuine issue of fact regarding the validity of the release. First, he states that the circumstances surrounding the signing of the document raise questions about its enforceability. Second, he states that there was a mutual mistake of fact by the parties when signing the release, thereby invalidating the document.

#### 1. Circumstances surrounding the release

In analyzing the validity of the release, the court is guided by the general principles of admiralty law which recognize that the rights of seaman are to be jealously protected by the courts. *See Davis v. American Commercial Lines, Inc.* 823 F.2d 1006 (6th Cir.1987), *cert. denied,* 484 U.S. 1067, 108 S.Ct. 1031, 98

---

5. The release applied to "any other person or entity" and if valid, would bar Moreno's actions against all other parties to this action. *Melson v.*

*Naviera Bilbanbaina,* 1973 A.M.C. 876, 474 F.2d 1342 (4th Cir.1973).

L.Ed.2d 995 (1988). As Justice Story explained more than a century ago:

"They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner as courts of equity are accustomed to threat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que rustent with their trustees.... If there is any undue inequality in terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable.... And on every occasion the court expects to be satisfied, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of the seamen."

See *Garrett v. Moore–McCormack Co.*, 317 U.S. 239, 246–47, 63 S.Ct. 246, 251–52, 87 L.Ed. 239 (1942) (quoting Justice Story) (citations omitted).

■ Because of this protection, a release signed by a seaman will be subjected to considerable scrutiny, the degree of which is greater than that given to a release signed by an ordinary worker. *See* 1A Benedict on Admiralty @ 6, pp. 1–47. Consequently, the parties seeking to enforce the release (i.e. Eastern Shore, Marinex and Carolina Dream) bear the burden of showing its validity. *Garrett v. Moore–McCormick Co.*, 317 U.S. 239, 248, 63 S.Ct. 246, 252, 87 L.Ed. 239 (1942). As the Supreme Court noted:

The burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion,

and that it was made by the seaman with full understanding of his rights. The adequacy of the consideration and the nature of the medical and legal advise available to the seaman at the time of signing the release are relevant to an appraisal of this understanding.

*Id.* Thus, some of the relevant factors to consider when determining the validity of the release are: (1) the adequacy of the consideration; (2) the medical advice available to the seaman; (3) the legal advice available to the seaman; and (4) the arm's length relationship between the parties. *See id.*

■ In analyzing the circumstances surrounding the signing of the release, the court finds that there are genuine issues of material fact which bring into question its enforceability. With regard to the fourth factor mentioned above, the court has questions regarding the arm's length exchange between the parties. The timing of the release, signed by Moreno within sixteen hours of the accident, at a time when he had been operating with little rest, raises questions as to its validity. While Moreno declined to consult an attorney and stated that he knew he was giving up his rights to bring suit, there is some confusion surrounding his decision to sign the release (i.e. his alleged fear that he would not receive reimbursement without a release) and his understanding of the terms of the release (i.e. whether it included future employment). The court also finds genuine issues of fact involving the adequacy of consideration, a small portion of which ($250) covered Moreno's hardship. *See Davis v. American Commercial Lines*, 823 F.2d at 1008 (adequacy of consideration is a critical factor and shipowner's burden is particularly difficult when the consideration is inadequate). For these reasons, the court finds genuine issues of material fact regarding the enforceability of the release.[6]

---

6. The cases cited by the moving parties in support of their motion are distinguishable on the facts and the issues raised. *Compare Durden v. Exxon Corporation, et al.*, 803 F.2d 845 (5th Cir.1986) (court upholds $87,000 release signed by unrepresented captain two years after accident where medical condition fully understood by captain and release signed to avoid risks of litigation); *Borne v. A & P Boat Rentals No. 4,*

*Inc.*, 780 F.2d 1254 (5th Cir.1986) (release upheld where seaman and his counsel, after first day of trial, accept $9000 release offer, since release was not the product of bad faith negotiation, was reached at arm's length, and was not the product of inadequate legal or medical advice or fraud or deception); *Melson v. Naviera Bilbanbaina*, 1973 A.M.C. 876, 474 F.2d 1342 (4th Cir.1973) (seaman, who signed release 6 months

### 2. Mutual Mistake of Fact

■ While Moreno has satisfied his burden in opposing summary judgment, the court will nevertheless address his mutual mistake of fact argument, which is equally compelling. Moreno contends that since all parties were under the erroneous belief that he was not hurt at the time of the signing of the release, a genuine issue is raised regarding the validity of the release.

Courts have approached the mutual mistake of fact issue when reviewing a release in one of two manners. Those courts which have set aside the release (at least for summary judgment purposes), and found a mutual mistake of fact, have done so when parties were basing their decision on a faulty *diagnosis* of the seaman's medical condition. *See Wooten v. Skibs*, 431 F.2d 821 (4th Cir.1969) (reversing summary judgment in favor of vessel where release was based on potentially erroneous medical advice); *Robertson v. Douglas Steamship Company*, 510 F.2d 829 (5th Cir.1975) (court affirms jury's disregard of release, noting that all parties were operating under a mistaken *diagnosis* of present injury).

Those courts which have upheld releases, and found no mutual mistake of fact, have done so when the actual medical condition was properly diagnosed, even if the *future prognosis* turned out to be less than accurate. *See Strange v. Gulf & Southern S.S. Co.*, 495 F.2d 1235 (5th Cir.1974). In distinguishing these two types of situations, the Fifth Circuit has explained:

> [w]hile it is true that a release should not be set aside for mutual mistake concerning the extent and outcome of injuries, which

are necessarily future rather than present facts, it does not follow that a release should not be set aside for mutual mistake concerning the nature of the injuries, which is a present fact. The legal distinction must rest on the medical difference between diagnosis and prognosis.

*Robertson*, 510 F.2d at 829.

In the instant case, the court is cognizant of the fact that, unlike the scenario in many of the aforementioned cases, there was no faulty diagnosis from a doctor (Moreno didn't see one) and no indication from Moreno that he was injured. Nevertheless, if Moreno's evidence is to be believed, Moreno's herniated disk resulted from the accident, although his condition did not manifest itself until after the signing of the release. Under these circumstances, the court likens Moreno's situation with that seen in the faulty diagnosis cases, where the parties were operating under an erroneous assessment of the seaman's present medical condition. While the erroneous assessment is the product of Moreno's own evaluation, the court does not conclude that such a circumstance should preclude him from raising this issue in light of the protections afforded to seaman. Therefore, at least at this stage of the proceedings, Moreno has raised questions as to whether the parties were operating under a mutual mistake of fact which would negate the release.

## V. CONCLUSION

Moreno has raised genuine issues of material fact regarding the validity of the release. For these reasons, the motion for summary judgment filed by Marinex and joined by Carolina Dream and Eastern Shore is DENIED.

---

after injury and was not challenging adequacy of consideration, overreaching, etc., unsuccessfully asserts that he did not intend to release all other parties); *Braxton v. Zapata Offshore Company*, 684 F.Supp. 921 (E.d. Texas 1988) (court grants summary judgment for shipowner where circumstances surrounding seaman's release, signed six months after accident, indicated that he fully understood he was giving up the potential of bringing a successful lawsuit and understood his medical condition); *Politis v. The S/S Oakhurst*, 177 F.Supp. 761 (D.Va.1959) (court upholds release, signed by seaman who lost several fingers in accident five months earlier, finding no indication of overreaching and noting settlement oc-

curred at seaman's insistence); *with Davis v. American Commercial Lines*, 823 F.2d 1006, 1008 (6th Cir.1987) (summary judgment in favor of vessel reversed and material issue of fact found regarding validity of release, signed by seaman who permanently injured wrist one year earlier and settled for only $7500 after declining legal representation); *Robertson v. Douglas Steamship Company*, 510 F.2d 829 (5th Cir.1975) (court affirms jury verdict in favor of seaman despite fact that he signed release, entered into one year after accident, since release was the product of mutual mistake of fact regarding his medical condition).

The Clerk is DIRECTED to send a copy of this order to plaintiff and counsel for the defendants.

It is so ORDERED.